UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN – SOUTHERN DIVISION

LITTLE TRAVERSE BAY BANDS OF
ODAWA INDIANS, a federally recognized
Indian tribe,

          Plaintiff,

v.

RICK SNYDER, Governor of the State of
Michigan.

          Defendant.

Court File No.15-850

**Complaint for Declaratory and Injunctive Relief**

Plaintiff, the Little Traverse Bay Bands of Odawa Indians, by and through its counsel alleges:

**Nature of the Action**

1. Executive Orders of 1855 and the 1855 "Treaty with the Ottawa and Chippewa"[1] guaranteed that the predecessor bands of the Plaintiff Little Traverse Bay Bands of Odawa Indians (the "Tribe") would never have to leave a small portion of their ancestral homelands reserved to them and their future generations, and that they would have the power to exercise their sovereign powers within the boundaries of their reservation, which stretches 32 miles north-

---

[1] Exec. Order (Aug. 9, 1855), I Kappler: Laws: Pt. III: Exec. Orders Relating to Indian Reservations 849-50 (1904), *available at* http://digital.library.okstate.edu/kappler/Vol1/HTML_files/MIC0846.html (last visited July 22, 2015); *Treaty with the Ottawa and Chippewa*, 31 July 1855, 11 Stat. 621-629 ("1855 Treaty").

to-south from the northern tip of Michigan's lower peninsula along the eastern shore of Little Traverse Bay ("Reservation" or "Little Traverse Reservation").

2. The Tribe has continuously asserted its right to occupy and exercised its sovereign governmental authority within the Reservation.

3. The Reservation has never been diminished or disestablished.

4. The United States government acknowledges the continued existence of the Reservation. But the State of Michigan does not recognize or respect the Reservation boundaries.

5. The Tribe brings this action for an order declaring that the lands within the boundaries of the Reservation are Indian country under federal law and enjoining the State from its improper exercises of authority within the Reservation.

6. This determination has significant present-day jurisdictional and governance ramifications for the Tribe. The Tribe seeks this declaration to protect its most culturally and historically valuable asset—its homeland—which the Tribe's ancestors fought to preserve and protect for all future generations.

**Parties**

7. Plaintiff Little Traverse Bay Bands of Odawa Indians is a federally recognized Indian Tribe.[2] The Tribe is the present-day successor of Odawa[3] signatory bands to the 1855 Treaty.

---

[2] Indian Entities Recognized and Eligible To Receive Services from the United States Bureau of Indian Affairs, 80 Fed. Reg. 1944 (Jan. 14, 2015).

[3] Reaffirmation Act, 25 U.S.C. § 1300k-4(b)(2)(A). Treaties and subsequent documents refer to the bands as "Ottawa," but the Tribe uses the more accurate transliteration, "Odawa."

8. Defendant Rick Snyder is the Governor of the State of Michigan. He is the head of the State's executive branch, and he is responsible for the overall adoption and administration of State agency policies, and for execution of laws within the State, including within the State's counties, townships, and other municipalities, all of which are creatures of the State and act through the State's delegated authority. The Tribe sues Snyder in his official capacity for the State of Michigan, and refers to Snyder, Michigan, and "the State" interchangeably.

**Jurisdiction and Venue**

9. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1362 (jurisdiction over actions brought by Indian tribes arising under the Constitution, laws, or treaties of the United States) because this action is brought by a federally recognized Indian tribe with a governing body duly recognized by the Secretary of Interior and raises substantial questions of federal law arising under the Tribe's treaties with the United States and under federal common law.

10. The Court has personal jurisdiction over the Defendant because Governor Snyder resides in Michigan and, in his official capacity, exercises his authority throughout the State.

11. The allegations of the Complaint give rise to an actual controversy within the meaning of 28 U.S.C. § 2201.

12. This Court has jurisdiction under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), to issue a judgment declaring the rights of the Tribe to its Reservation under the 1855 Treaty and Executive Order.

13. This Court has jurisdiction to issue injunctive relief under its equitable powers because no other remedy at law exists to stop the State from continuing to unlawfully deprive the Tribe of its treaty-protected rights.

14. Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the Tribe's claims occurred and are occurring on the Tribe's Reservation, which is within this District.

**Factual Background**

15. Hundreds of years before the arrival of Europeans, the Odawa Indians migrated into the area now known as Little Traverse Bay, the Beaver, Garden and High Islands in the northwest corner of the Lower Peninsula of Michigan, and the north shore of Lake Michigan in the southeast portion of the Upper Peninsula. The Odawa Indians established villages in these locations.

16. The first recorded European contact with the Tribe occurred in 1615. Odawa Indians occupied the territory for the next 250 years.

17. By the 1830s, the federal government's Indian policy focused on securing treaty cessions of land from Indians, removing Indians from these lands, and encouraging non-Indian settlement of the lands.

18. During this era, federal Indian agents pressured the Odawa to cede their lands and relocate to unfamiliar western locations.

19. The bands of Odawa that today make up the Little Traverse Bay Bands of Odawa Indians fought for the right to remain in their homeland. In 1835, Odawa leaders traveled to

Washington DC in an effort to secure their homeland. That effort culminated in the 1836 treaty negotiations between these Odawa and Chippewa bands with the United States.

20. In negotiating the 1836 Treaty, certain Odawa and the Chippewa bands retained fourteen reservations, including a 50,000-acre reservation on Little Traverse Bay, and a reservation consisting of the Beaver Islands.[4] The bands also reserved hunting, fishing, and other usufructuary rights throughout the cession area.[5] In exchange, U.S. negotiators secured an over-26,000,000-acre cession that included nearly 14,000,000 acres of land that would become northwestern Michigan.[6]

21. Rather than ratify the Treaty as negotiated, the United States Senate unilaterally modified the reservation clause, time-limiting it to only five years "unless the United States grant them permission to remain on said lands for a longer period."[7]

22. The Odawa and Chippewa only accepted this amendment upon assurances from Michigan agent and U.S. negotiator Henry Schoolcraft that the United States would not enforce the five-year limit and the bands could remain on their reservation beyond the five-year sunset.

23. The Odawa understood Schoolcraft's assurances to mean that they would, in fact, never be removed from the reserved land in Michigan.

24. The United States never did remove the Odawa, and instead tacitly gave permission for them to remain on their reservations beyond the five-year term and continuously recognized that the Odawa retained their reservation from 1841-1855.

---

[4] Treaty of Washington, March 28, 1836, 7 Stat. 491.
[5] 7 Stat. 491 at Article 13.
[6] 7 Stat. 491.
[7] 7 Stat. 497.

5

25. Although the United States never removed the Odawa, the Odawa nevertheless lived in constant fear of being forced from their reserved lands. This uncertainty as well as the United States' failure to fulfill certain obligations under the 1836 Treaty prompted negotiation for a new treaty.

26. By 1854 the United States had shifted its Indian policy to focus on the creation of reservations, with the intent of concentrating Indians on such reservations in order to protect them from the onslaught of non-Indian settlement while simultaneously making the Indians easier for the government and missionary groups to "civilize." Commissioner of Indian Affairs George Manypenny was one of the principal proponents of this policy and the federal government official responsible for implementing this changed federal policy.

27. On May 14, 1855, President Pierce signed an executive order withdrawing 27 townships and fractional townships from public sale in advance of the upcoming treaty councils, so that no claims could be staked on the intended reservation during the treaty negotiations.[8]

28. In the negotiations that resulted in the 1855 Treaty of Detroit, the United States intended to secure permanent communities and homes for the bands and to insulate their communities from non-Indian settlers and simplify the government's planned "civilization" of Indians.

29. The Odawa and Chippewa also intended to reserve lands for their bands and to maintain their political, cultural and economic integrity.

---

[8] R. McClelland to J. Wilson, 14 May 1855, NARA-DC, RG49, NARA-DC, RG49, Entry 29, Division A, Chief Clerks Office, Notices to Receivers of Local Land Offices Relating to their Appointments, 1840-44, box 7.

6

30. A foremost concern for the Odawa was to alleviate removal fears by securing permanent homelands for themselves and future generations, in perpetuity.

31. The 1855 Treaty effectuated the parties' intentions by securing for the Tribe a permanent nearly-216,000 acre reservation.

32. The 1855 Treaty sets forth the reservations by surveyed townships. It states, in relevant part:

> In view of the existing condition of the Ottowas and Chippewas, and of their legal and equitable claims against the United States, it is agreed between the contracting parties as follows:
>
> ARTICLE 1.
>
> The United States will withdraw from sale for the benefit of said Indians as hereinafter provided, all the unsold public lands within the State of Michigan embraced in the following descriptions, to wit: . . .
>
> *Third.* For the Beaver Island Band—High Island, and Garden Island, in Lake Michigan, being fractional townships 38 and 39 north, range 11 west—40 north, range 10 west, and in part 39 north, range 9 and 10 west.
>
> *Fourth.* For the Cross Village, Middle Village, L'Arbrechroche and Bear Creek bands, and such Bay du Noc and Beaver Island Indians as may prefer to live with them, townships 34 to 39, inclusive, north, range 5 west—townships 34 to 38, inclusive, north range 6 west—townships 34, 36, and 37 north, range 7 west, and all that part of township 34 north, range 8 west, lying north of Pine River.

33. The bands described in paragraphs Third and Fourth of Article 1 of the 1855 Treaty are now known as the Little Traverse Bay Bands of Odawa Indians.[9]

---

[9] Reaffirmation Act, 25 U.S.C. § 1300k-4(b)(2)(A).

34. The Reservation boundary described in paragraphs Third and Fourth of Article 1 is clear and unambiguous.[10]

35. The 1855 Treaty Reservation stretches 32 miles north-to-south from the northern tip of Michigan's lower peninsula along the eastern shore of Little Traverse Bay. It includes the cities of Cross Village, Good Hart, Harbor Springs, Petoskey, and parts of Charlevoix. It also includes Garden and High Islands. The Reservation consists of 337 square miles, and approximately 103 miles of Lake Michigan Shoreline.

36. The 1855 Treaty expressly references the Article 1 "reservations" in subsequent provisions.

37. The 1855 Treaty included an allotment scheme, which was typical of those reservation treaties Commissioner Manypenny negotiated, as an additional means of promoting Indian "civilization."

38. To further register and mark the 1855 Treaty Reservation immediately following execution of the Treaty, Commissioner Manypenny prepared a list of the lands to be withdrawn from sale to enable the Odawas and Chippewas to select the land guaranteed to them by the Treaty. The 1855 Treaty added to the land withdrawn from sale by the May 14, 1855 Executive Order, reserving Garden Island and High Island in lieu of land on Beaver Island.

39. With certain exceptions to special tracts previously appropriated, the lands on Manypenny's list were withdrawn from sale by Executive Order on August 9, 1855.[11]

---

[10] 11 Stat. 621; *see also* Ex. A (Map).
[11] Executive Order with accompanying maps, 9 August 1855, NARA-DC, RG49, Entry 191, Division D, Mails and Files Division, Executive Orders of Presidents of the United States Relating to Land Matters, 1806-1913, Executive Order 8/9/1855.

40. After the 1855 Treaty, land frauds plagued the area, but the Odawa continued to live on the Reservation and maintain it as their homeland.

41. The federal Indian agents failed to fully execute the allotment scheme of the 1855 Treaty.

42. To address the delays in allotments and the land-fraud and land-title issues, Congress passed an 1872 act that authorized Indian homesteads and allowed the United States to effectuate the original allotment plan of the 1855 Treaty.[12] The Act facilitated the terms of the 1855 Treaty by directing a two-step process: first, that Indian entries be processed and secured; and second, allowing the United States to sell the land that remained within the Reservation after Indian selection to non-Indians.

43. The 1872 Act is consistent with continued reservation status.

44. Land fraud continued to occur, precipitating technical amendments to the 1872 Act in 1875[13] and 1876.[14]

45. The federal government's inability to administer the allotment process resulted in title to much of the Reservation passing to non-Indians, but this did not operate to disestablish or diminish the Reservation.

46. In fact, Congress has never diminished or disestablished the Reservation.

47. In the decades following ratification of the 1855 Treaty, federal government agents continued to acknowledge the existence of the Little Traverse Reservation. For example:

---

[12] 10 June 1872, 17 Stat. § 381, An Act for the Restoration to Market of Certain Lands in Michigan, ("1872 Act").
[13] 3 March 1875, 18 Stat. § 516.
[14] 23 May 1876, 19 Stat. § 55.

    a.   In 1856, U.S. Deputy Surveyor William Burt described his instructions from the Surveyor General that "it is very necessary to have the survey of the Reservations made without delay," and asked Michigan Indian Agent Henry C. Gilbert to assist his survey efforts;[15]

    b.   In correspondence during the January and February of 1858, Michigan Indian Agent A.M. Fitch and Acting Commissioner of Indian Affairs Charles E. Mix exchanged correspondence about the need to survey lands promised under the 1854 treaty in order to "properly locate[ the bands] on their reservations[;]"[16]

    c.   Another 1858 letter from Michigan Indian Agent A.M. Fitch to Acting Commissioner of Indian Affairs Charles E. Mix described surveying and platting "lands for the Ottawas & Chippewas of Mich[iga]n on Reservations set apart for them by the treaty of July 31st 1855[;]"[17]

---

[15] William Burt to Henry C. Gilbert, 20 July 1856, NARA-DC, RG75, Entry 1130, Letters Received by the Michigan Superintendency and Mackinac Agency, 1836-1870, Box 11, Volume 30, 1857.

[16] Henry C. Gilbert to Charles E. Mix, 29 January 1858, National Archives and Records Administration, Record Group 75, Records of the Bureau of Indian Affairs, Letters Received by the Office of Indian Affairs, 1824-1881 (Washington, D.C.: National Archives Microfilms), Microcopy 234, Reel 406: Frames 169-171; A. M. Fitch to Charles E. Mix, 1 February 1858, National Archives and Records Administration, Record Group 75, Records of the Bureau of Indian Affairs, Letters Received by the Office of Indian Affairs, 1824-1881 (Washington, D.C.: National Archives Microfilms), Microcopy 234, Reel 406: Frames 36-38.

[17] A[ndrew] M. Fitch to Chas. [Charles] E. Mix, 3 March 1858, National Archives and Records Administration, Washington, D.C., Record Group 75, Entry 1132, Letters Sent by the Michigan Superintendency and Mackinac Agency, 1836-1859, Box 3, Volume 6.

      d. In 1869, Indian Agent D.C. Leach wrote to Commissioner of Indian Affairs E.S. Parker proposing to "enlarg[e] the Little Traverse Reservation" to accommodate other tribes in a single site.[18]

48. The Tribe has maintained its presence on the Reservation prior to, during, and after 1855, including through the present day.

49. As a federally recognized tribe, the Tribe exercises jurisdiction throughout the Reservation. For example:

      a. The Tribe's federally approved Constitution defines the Tribe's jurisdiction as "all the territory" that lies "within the boundaries of the reservation[] for the Little Traverse bay Bands of Odawa Indians as set out in Article I, paragraphs third and fourth of the 1855 Treaty, 11 Stat. 621[;]"[19]

      b. The Tribe's Department of Human Services exercises jurisdiction over all Indian-child welfare matters within the Reservation boundaries, and exercises jurisdiction over all adult-protection cases involving tribal adults within the Tribe's Reservation;

      c. The Tribe applies its hunting and conservation laws to all lands and waters within the boundaries of the Tribe's Reservation;

---

[18] D. C. Leach to E. S. Parker, 19 October 1869, National Archives and Records Administration, Record Group 75, Records of the Bureau of Indian Affairs, Letters Received by the Office of Indian Affairs, 1824-1881 (Washington, D.C.: National Archives Microfilms), Microcopy 234, Reel 408: Frames 864-866.

[19] Little Traverse Bay Bands of Odawa Indians Const. Art. III § H, Art. IV § B, *available at* http://www.ltbbodawa-nsn.gov/OdawaRegister/LTBB%20Constitution.pdf (last visited July 8, 2015).

11

    d. The Tribe applies its building and zoning codes to properties it owns within the Reservation boundaries, regardless of whether it holds the lands in fee or trust; and

    e. The Tribe receives federal Indian Reservation Roads funds that it shares with local governments to build and maintain roads, including roads throughout the reservation that do not provide access to trust lands. The funding is only available to the Tribe because the roads are within the Tribe's Reservation.

50. Over the years, the State and local municipalities have acknowledged the existence of the Reservation and the Tribe's sovereignty through a variety of inter-governmental coordinations and agreements. For example:

    a. The Tribe's tax agreement with the State exempts tribal citizens within the "tax-agreement area" from paying state income tax. Although it does not match the full boundaries of the reservation, the tax agreement area is much broader than the Tribe's trust lands and much more closely follows the Tribe's reservation boundary;[20]

    b. A Memorandum of Agreement between the State's Department of Environmental Quality and the Tribe recognizes the Tribe "as a governmental partner" in the State's assumption of the management of response activities that the U.S. Environmental Protection Agency began at an on-reservation leachate site;

---

[20] *See* Ex. A (Map).

    c. State conservation officers and the Michigan Department of Natural Resources are aware that the Tribe applies tribal hunting and conservation laws to all land and waters within the Reservation, but have not objected to the Tribe's exercise of jurisdiction;

    d. Emmet and Charlevoix counties have entered into numerous agreements with the Tribe to construct and maintain roads to certain tribal specifications and with funding that the Tribe secured from the Bureau of Indian affairs; and

    e. Various police departments, including Alcona County, Alpena County, Antrim County, Benzie County, Charlevoix County, Cheboygan County, Crawford County, Emmet County, Grand Traverse County, Kalkaska County, Leelanau County, Manistee County, Missaukee County, Montmorency County, Osceola County, Oscoda County, Otsego County, Presque Isle County, Roscommon County, Wexford County, Boyne City, Rogers City, Village of Bellaire, City of Cadillac, City of Charlevoix, City of Frankfort, Village of Kalkaska, City of Petoskey, and City of Traverse City have from time to time entered into deputization, prisoner-housing, and mutual aid agreements with the Tribal Police and request Tribal Police assistance from time to time.

51. But the State has been inconsistent in its treatment of the Reservation, and in fact it has expressly refused to recognize the Tribe's Reservation in a number of ways that threaten the Tribe's autonomy and sovereignty, and that violate the 1855 Treaty. For example:

a. The State insists upon asserting jurisdiction over Indian child-welfare matters on fee land within the Reservation. This violates the Indian Child Welfare Act,[21] which gives tribes sole authority over Indian-child welfare matters within the boundaries of its reservation.[22] On-the-ground confusion often arises in these contexts when children and families are forced to deal with both the Tribe and the State. Often, the agencies apply differing standards for when a family meets program requirements, what efforts should be used to assist the family, and when a child should be removed (with the Tribe's guidelines tending to be even more protective over the child than the State's guidelines).

b. The graves protection provisions of the Native American Graves Protection and Reparations Act[23] apply to Native American human remains, funerary objects, and other kinds of "cultural items" located on or within federal land and "all lands within the boundaries of any Indian reservation." 25 U.S.C. §3001(15). As such, NAGPRA recognizes tribal authority over Native American graves and funerary objects within Reservation boundaries, regardless of land ownership status. But certain local governments and municipalities do not follow NAGPRA procedures for the inadvertent discovery or planned excavation of the Tribe's cultural items on Reservation land.

---

[21] 25 U.S.C. §§1901-1963 ("ICWA").
[22] 25 U.S.C. § 1911(a).
[23] 25 U.S.C. §§ 3001 – 3013 ("NAGPRA").

14

    c. Under federal law, the State may not impose individual income tax on tribal citizens who live and work within the Reservation. But when the State negotiated a tax agreement with the Tribe, it refused to exempt all tribal citizens residing on the Reservation from income taxation. Instead, the State would only agree to exempt those living within a "tax agreement area" from state income taxation. Three townships located within the reservation boundary are not included in the "tax agreement area."[24] The State forces tribal citizens who live within these three townships of the Reservations and work within the Reservation to pay state income taxes contrary to federal law.

52. The State's inconsistent treatment of the Reservation injures the Tribe's ability to fully assert its jurisdiction and sovereignty:

    a. The health, safety, and spiritual and cultural wellbeing of the Tribe's children within the Reservation depend on the exercise of LTBB's exclusive jurisdiction under ICWA.

    b. The health, safety, and spiritual and cultural wellbeing of the Tribe's vulnerable elder adults depend on the Tribe's ability to exercise jurisdiction throughout the Reservation;

    c. Sacred burial grounds that include human remains and funerary objects are located throughout the Reservation. Application of NAGPRA would enable the Tribe to protect these cultural objects;

---

[24] *See* Ex. A (Map).

    d.   The Violence Against Women Reauthorization Act of 2013[25] included a "special domestic violence criminal jurisdiction" provision. The program allows tribal courts to prosecute non-Indian defendants accused of domestic or dating violence against Native American women on a Reservation. Boundary recognition would bring clarity to the Tribe's assertion of VAWA jurisdiction; and

    e.   The Tribe's ability to protect air, land, and water in its homeland depends on its ability to continue monitoring environmental conditions throughout its Reservation.

53. Equally important social and political concerns hinge on Reservation recognition. Tribal ancestors steadfastly resisted removal to enable future generations to continue Tribal traditions and culture in the Tribe's ancestral homeland. Protecting the Reservation is an important aspect of honoring the work of the Tribe's ancestors and continuing the Tribe's cultural traditions, which are tied to the Reservation.

## Claim for Relief

### Count 1

54. The Tribe realleges and incorporates by reference paragraphs 1 through 53 as if fully set forth herein.

55. The Reservation as set forth in Article 1 of the 1855 Treaty of Detroit, paragraphs Third and Fourth exists today, and consists of 32 miles north-to-south from the northern tip of Michigan's lower peninsula along the eastern shore of Little Traverse Bay. It includes the cities

---

[25] 8 U.S.C. § 1367 ("VAWA").

of Cross Village, Good Hart, Harbor Springs, Petoskey, and parts of Charlevoix. It also includes Garden and High Islands.

56. The United States Congress has never revoked, disestablished, or diminished the Reservation.

57. The Reservation is Indian country as that term is used in 18 U.S.C. § 1151 and United States Supreme Court decisions.

58. The State's inconsistent treatment of the Little Traverse Reservation causes the Tribe irreparable harm because it deprives the Tribe of the bargained-for benefits of the 1855 Treaty and infringes upon the Tribe's inherent sovereignty. The Tribe cannot fully assert its sovereignty and jurisdiction over its territory until the State recognizes the Tribe's retained right to govern the Reservation established by the Executive Orders of 1855 and 1855 Treaty with the Ottawa and Chippewa.

59. The Tribe has no adequate remedy at law for the damages caused by the State's actions; the Tribe's right to recognition of its reservation is unique and is related to the sovereignty and jurisdiction of the Tribe.

**Demand for Relief**

**WHEREFORE**, the Tribe respectfully asks this Court to enter judgment in its favor and to:

I. Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201 and § 2202 and other applicable law, against the Defendant Governor of Michigan declaring that the Little Traverse Reservation as established by the Executive Order of 1855 and the 1855 Treaty of Detroit exists today, and that all lands within the Reservation are Indian country under federal law.

II.      Issue a permanent injunction, pursuant to the Court's equity jurisdiction, 42 U.S.C. § 1983, and other applicable law, forever barring the current and future Defendant Governor of Michigan, as well as the State's agents, servants, employees, officers and attorneys, municipalities, and anyone acting in concert with them:

    1.    From asserting jurisdiction over the Tribe or Tribal citizens in any way inconsistent with the Reservation's status as Indian country; and

    2.    From taking any actions that would interfere with the rights of the Tribe and its citizens under federal law to be otherwise free of state law and regulation within the Little Traverse Reservation.

III.     Grant any further relief as the Court may deem appropriate under the circumstances.

Dated: August 21, 2015

*Counsel for Little Traverse Bay Bands of Odawa Indians*

s/ Jessica Intermill

William A. Szotkowski (MN # 161937)
Jessica Intermill (MN # 0346287)
Andrew Adams III (MN #0392062)
Jessie Stomski Seim* (MN # 0388973)
*Admission pending*
Hogen Adams PLLC
1935 W. County Rd B2, Suite 460
St. Paul, MN 55113
Phone: (651) 842-9100
Fax: (651) 842-9101
E-Mail: bszotkowksi@hogenadams.com
        jintermill@hogenadams.com
        aadams@hogenadams.com
        jseim@hogenadams.com

James A. Bransky (MI # P38713)
9393 Lake Leelanau Dr.
Traverse City, MI 49684-7713
Phone: (231) 946-5241
Fax: (231) 242-1415
E-Mail: jbransky@chartermi.net

Donna Budnick (MI # P44291)
7500 Odawa Circle
Harbor Springs, MI 49740-9692
Phone: (213) 242-1424
Fax: (213) 242-1434
E-Mail: dbudnick@ltbbodawa-nsn.gov