# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  May 18, 2021

Mr. R. Lance Boldrey
Ms. Erin Sedmak
Dykema, 201 Townsend Street, Suite 900
Lansing, MI 48933

Mr. James Alan Bransky
9393 Lake Leelanau Drive
Traverse City, MI 49684-7713

Ms. Kelly M. Drake
Ms. Laura Rose LaMore
Ms. Jaclyn Shoshana Levine
Office of the Attorney General of Michigan
P.O. Box 30755
Lansing, MI 48909

Mr. Jeffrey Charles Gerish
Plunkett Cooney
38505 Woodward Avenue, Suite 100
Bloomfield Hills, MI 48304

Mr. David A. Giampetroni
Mr. Riyaz A. Kanji
Kanji & Katzen
303 Detroit Street, Suite 400
Ann Arbor, MI 48104

Mr. Scott W. Howard
Mr. William Rastetter
Olson, Bzdok & Howard
420 E. Front Street
Traverse City, MI 49686

Mr. Ryan K. Kauffman
Mr. Thaddeus E. Morgan
Fraser, Trebilcock, Davis & Dunlap
124 W. Allegan
Suite 1000
Lansing, MI 48933

Ms. Mary Gabrielle Sprague
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044

Ms. Jill Margaret Wheaton
Dykema Gossett
2723 S. State Street, Suite 400
Ann Arbor, MI 48104

      Re:  Case Nos. 19-2070/19-2107*, Little Traverse Bay Bands v. Gretchen Whitmer, et al*
          Originating Case No. : 1:15-cv-00850

Dear Counsel,

    The court today announced its decision in the above-styled cases.

    Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                Yours very truly,

                Deborah S. Hunt, Clerk

                Cathryn Lovely
                Deputy Clerk

cc:  Mr. Thomas Dorwin

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0109p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

LITTLE TRAVERSE BAY BANDS OF ODAWA INDIANS,

*Plaintiff-Appellant/Cross-Appellee,*

*v.*

GRETCHEN WHITMER, Governor of the State of Michigan,

*Defendant-Appellee,*

CITY OF PETOSKEY, MICHIGAN; CITY OF HARBOR SPRINGS, MICHIGAN; EMMET COUNTY, MICHIGAN; CHARLEVOIX COUNTY, MICHIGAN,

*Intervenors Appellees/Cross-Appellants,*

TOWNSHIP OF BEAR CREEK; TOWNSHIP OF BLISS; TOWNSHIP OF CENTER; TOWNSHIP OF CROSS VILLAGE; TOWNSHIP OF FRIENDSHIP; TOWNSHIP OF LITTLE TRAVERSE; TOWNSHIP OF PLEASANTVIEW; TOWNSHIP OF READMOND; TOWNSHIP OF RESORT; TOWNSHIP OF WEST TRAVERSE; EMMET COUNTY LAKE SHORE ASSOCIATION; THE PROTECTION OF RIGHTS ALLIANCE; CITY OF CHARLEVOIX, MICHIGAN; TOWNSHIP OF CHARLEVOIX,

*Intervenors-Appellees.*

Nos. 19-2070/2107

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:15-cv-00850—Paul Lewis Maloney, District Judge.

Argued:  December 1, 2020

Decided and Filed:  May 18, 2021

Before:  BATCHELDER, CLAY, and BUSH, Circuit Judges.

———————————

## COUNSEL

**ARGUED:**  David A. Giampetroni, KANJI & KATZEN, P.L.L.C., Ann Arbor, Michigan, for Little Traverse Bay Bands of Odawa Indians.  Jaclyn Shoshana Levine, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Gretchen Whitmer.  Jeffrey C. Gerish, PLUNKETT COONEY, Bloomfield Hills, Michigan, for City of Petoskey, City of Harbor Springs, Emmet County and Charlevoix County.  R. Lance Boldrey, DYKEMA GOSSETT PLLC, Lansing, Michigan, for Appellees Emmet County Lake Shore Association and Protection of Rights Alliance.  **ON BRIEF:**  David A. Giampetroni, Riyaz A. Kanji, KANJI & KATZEN, P.L.L.C., Ann Arbor, Michigan, James A. Bransky, LITTLE TRAVERSE BAY BANDS OF ODAWA INDIANS, Traverse City, Michigan, for Little Traverse Bay Bands of Odawa Indians.  Jaclyn Shoshana Levine, Kelly M. Drake, Laura R. LaMore, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Gretchen Whitmer.  Jeffrey C. Gerish, PLUNKETT COONEY, Bloomfield Hills, Michigan, for City of Petoskey, City of Harbor Springs, Emmet County and Charlevoix County.  R. Lance Boldrey, Jill M. Wheaton, Erin A. Sedmak, DYKEMA GOSSETT PLLC, Lansing, Michigan, for Emmet County Lake Shore Association and Protection of Rights Alliance.  Thaddeus E. Morgan, FRASER TREBILCOCK DAVIS & DUNLAP, P.C., Lansing, Michigan, for Township of Bear Creek, Township of Bliss, Township of Center, Township of Cross Village, Township of Friendship, Township of Little Traverse, Township of Pleasantview, Township of Readmond, Township of Resort, and Township of West Traverse.

———————————

## OPINION

———————————

CLAY, Circuit Judge.  The Little Traverse Bay Bands of Odawa Indians (the "Band") appeal the district court's decision granting summary judgment to Defendant Governor Gretchen Whitmer, in which the court held that the Treaty of 1855 did not create an Indian reservation for the Band under federal law.  The Band has lived in the State of Michigan for centuries. While often referred to as one tribe, the Band consists of several distinct factions, including at least five Ottawa and Chippewa tribes.   In the nineteenth century, the Band signed several treaty agreements with the United States government that allowed them to reserve and subsequently own land in Michigan. The meaning of one of those treaty agreements is in dispute here on appeal. For the reasons stated below, this court **AFFIRMS** the district court.

# I.  BACKGROUND

## A.  Factual History

Prior to the colonization of the Americas, the Little Traverse Bay Bands of Odawa Indians inhabited for centuries what is now considered northern Michigan.  At the turn of the nineteenth century, with the population growing within the United States, more white Americans began to settle in territories like Michigan where the Band resided.  As a result, the federal government took tribal land for its settlers and removed tribes, like the Band, to Indian settlements in the West, where they could supposedly be assimilated into American society as citizens.  For years, officials in the federal Department of Indian Affairs considered when and how to move tribes westward. Despite federal intentions to move tribes west, the Band in northern Michigan was determined to stay in their home territory.  For example, tribal leaders expressed how "[t]he soul shrink with horror at the idea of rejecting our country forever." (ECF No. 559-14 at PageID # 8088.)   They intended to "make arrangements with the government for remaining in the Territory of Michigan in the quiet possession of our lands, and to transmit the same safely to our posterity" and would "submit ourselves to the Laws of that country within whose lands we reside."  (*Id.* at PageID # 8087–088.)

In the summer of 1835, the Band contacted President Andrew Jackson to ask whether they could sell some of their land, and in return, stay in Michigan. President Jackson had not considered purchasing the land at first but inquired as to the amount for which the Band would sell the land.  Jackson delegated the negotiations to Michigan representatives, who instructed the Band not to travel to Washington unless requested.  Despite that message, and fearful that the United States would remove them by force, tribal members arrived in Washington in December 1835, looking to negotiate.  It appears, however, that no federal official met with the Band, and instead, the Band's wishes were communicated through letter.

Following the letter in 1835, the federal government agreed to purchase some of the Band's land and allow them to stay in Michigan temporarily.  In 1836, Secretary of War Lewis Cass appointed Henry Schoolcraft, Acting Superintendent of Indian Affairs for the Michigan Territory, to be the federal government's primary negotiator with the Band and to encourage

them to move westward after selling their land.  In March of 1836, Cass wrote Schoolcraft that he should "procure the land upon proper and reasonable terms for the United States" and "extinguish the Indian titles as our settlements advance so as to keep the Indians beyond our borders."  (ECF No. 559-15 at PageID # 8096.)

**Treaty of 1836**

In March of 1836, the Band traveled to Washington, D.C. to meet with federal officials, including Schoolcraft.  On March 15, 1836, Schoolcraft started the negotiations by agreeing to negotiate with delegates of every tribe within the Band.  He then asked each tribal leader how much of their land they wanted to sell.  To facilitate the agreement, he also proposed that the federal government would pay any debts the Band had to traders in Michigan and distribute annual annuities over twenty years for education, agriculture, and medicine.  Notably, Schoolcraft informed the Band that the President believed "[n]o objection will be made, if you deem it imperative, to your fixing on proper and limited reservations to be held in common; but the President judges it best, that no reservations should be made to individuals."  (ECF No. 558-4 at PageID # 6870.)

As the negotiations proceeded, different tribes within the Band, primarily the Chippewas and the Ottawas, differed over how the land should be sold.  One tribal leader expressed "fear that the whites, who will not be our friends, will come into our country and trouble us and that we shall not be able to know where our possessions are."  (*Id.* at PageID # 6871.)  The leader hoped that "some of our white friends [would] have lands among us and be associated with us" to ease tensions between the races.  (*Id.*)  Later in the negotiation, an Ottawa chief said he would refuse to sell their land after seeing how small the Band's reservation would be.  (*Id.* at PageID # 6872.)  As others spoke, a delegate from the tribe Labre Croche said he believed that white settlers had pressured the Band into selling their land, and that without this pressure, none of the tribes would agree to sell.  In response, Schoolcraft stated that he understood the varying opinions among the different tribes and would agree to purchase land from those who were willing, but he hoped the different tribes could come to a uniform agreement.  Schoolcraft proposed a reservation of 100,000 acres to the Band, and by the last day of negotiations on

March 28, 1836, the Band decided to agree to Schoolcraft's terms.  With negotiations completed, the tribes ceded almost 14 million acres of land to the United States.  A third of the ceded land was in the Upper Peninsula of Michigan, while the remaining two-thirds were located in the Lower Peninsula, and in total, the land equated to one-third of present-day Michigan.  In return, the Treaty promised a temporary reservation for the Band in Little Traverse Bay, Michigan, and thereafter, land west of the Mississippi in case the Band decided to move westward.  Before the treaty was ratified, the United States Senate added a provision that the reservation would only last "for the term of five years," which the Band reluctantly accepted.  (ECF No. 558-2 at PageID # 6831.)  In return, the federal government promised the Band $200,000 for "whenever their reservations shall be surrendered."  (*Id.*)

Article 1 of the Treaty provides that the Ottawa and Chippewa nations would cede land to the United States located in the eastern portion of the Upper Peninsula of Michigan and the northern portion of the Lower Peninsula.  In Article 2, the Band would reserve land "for their own use, to be held in common," including 50,000 acres on Little Traverse Bay, 20,000 acres on the north shore of Grand Traverse Bay, 70,000 acres on or north of the Pierre Marquetta river, 1,000 acres located by Chingassanoo, or the Big Sail, on Cheboigan, and 1,000 acres located by Mujeekewis on Thunderbay River.  (*Id.*)  Alongside that provision, Article 3 outlined other settlements where the Band could locate under the agreement, including several islands in northern Michigan.  And as agreed, Articles 4 and 5 required the United States to provide annuities for 20 years to assist the Band in education, agriculture, and medicine and to settle debts the tribes had with traders in their area.  Other provisions provided land west of the Mississippi River in case the Band decided to relocate, supported tribal members who were of mixed race, and provided reimbursement to the Band's leaders for traveling to negotiate the treaty.

**Events leading to the Treaty of 1855**

After signing the Treaty of 1836, the Band lived on the temporary reservation amidst an uncertain future in Michigan.  The Treaty was meant to expire in 1841.  In 1839, the Chippewa faction of the Band wrote to the Governor of Michigan to express "[h]ere alone, in Michigan, it

is here that we feel as if we could be happy."  (ECF No. 559-20 at PageID # 8133.)  They asked the Governor whether those who desired to stay in Michigan would be allowed to, whether they would have the right to buy lands from the government, and whether tribal members would be acknowledged as citizens.  Two years later, the Band asked President John Tyler to have the Treaty extended, but no record suggests it ever was.  The Treaty expired in 1841, but the United States never removed the Band from Michigan.  By the next decade, the federal government had abandoned its plan to move the Band west to a permanent reservation.  In March 1854, the head of the Michigan Indian Agency, Henry Gilbert, wrote a letter to the federal Commissioner of Indian Affairs outlining his intentions for the Band, stating, "that within three or four years all connection with & dependence upon Government on the part of the Indians may properly cease." (ECF No. 559-33 at PageID # 8285–286.)  In this same letter, Gilbert expressed how he planned to reach this intended goal:

> To set apart certain tracts of public lands in Michigan in locations suitable for the Indians & as far removed from white settlements as possible & within which every Indian family shall be permitted to enter without charge & to own and occupy eighty acres of land– The title should be vested in the head of the family & the power to alienate should be withheld– All the land embraced with the tract set apart should be withdrawn from sale & no white persons should be permitted to locate or live among them, except teachers, traders, & mechanics specially authorized by rules & regulations prescribed by the State Government– It may also be safely left to the same authority to terminate the restriction of the power to alienate their lands whenever deemed expedient & at the same time the unappropriated lands in the tracts withdrawn from sale should be again subject to entry.

(*Id.* at PageID # 8286.)

Meanwhile, in January of 1855, the Band wrote to the Commissioner of Indian Affairs, George Manypenny, indicating that they wanted to accumulate property in Michigan to leave to their children.  In February of 1855, the Band wrote another letter expressing anxiety over white settlers who were claiming land near them and petitioned to resolve their standing under federal treaties.  By 1855, settlement in Michigan had risen steadily.  As a result of this trend, Manypenny wanted to set land aside for Indian settlement that would not be sold in the public

marketplace.  Like Gilbert, Manypenny wanted to allot individual homes to the Band's members, and eventually, end their dependence on the federal government.

In December of 1854, Manypenny petitioned the Commissioner of the General Land Office for specific tracts of land to be set aside in Michigan.  In May of 1855, Manypenny, in a letter to Secretary of the Interior Robert McClelland, wrote:

> Measures should now be taken, in my judgment to secure permanent homes for the Ottawas and Chippewas, either on the reservations or on other lands in Michigan belonging to the Government, and at the same time, to substitute, as far as practicable, for their claim to lands in common, titles in fee to individuals for separate tracts of land.

(ECF No. 559-43 at PageID # 8376.)

Following Manypenny's request, and in anticipation of treaty negotiations with the Band, President Franklin Pierce issued an executive order later that May and set aside specific tracts of land earmarked for Indian settlement in what is now Emmet County, Michigan and Isabella County, Michigan.

**Negotiations for the Treaty of 1855**

In July of 1855, the Band's leaders met with federal and state officials to negotiate the Treaty of Detroit, now known as the Treaty of 1855, where both sides agreed that the Band would stay permanently in Michigan.  Gilbert led the negotiations with the Band.  On the first day, the Band's leader, Assagon, wanted to settle outstanding obligations the federal government had to the Band from prior treaties.  To the Band's disappointment, the government had few obligations remaining under previous treaties after counting treaty annuities already provided. Manypenny agreed to pay $200,000 to the Band but emphasized that the government wanted the Band to be independent.  At several points in the negotiations, the Band requested that the government keep the principal money and subsequently distribute its interest, so the payments would last for future generations. Gilbert refused the request.  He wanted the Band to "take care of themselves," and that included being responsible for their own finances.  (ECF No. 558-8 at PageID # 7029–031.)  Sitting alongside Gilbert, Manypenny told the Band that the government instead wanted to provide the Band with a permanent home.  In Manypenny's view, the

government did not expect the Band to settle in one location, but would not permit individuals to locate in indistinct locations.  Instead, Manypenny was willing to set tracts of land apart for small settlements in different places.  He insisted that areas closer together meant the Band's community could have schools and county organizations.  The Band agreed to live in proximity to one another but wanted clarification on land ownership, because they feared the land would eventually be taken from them.  In response to this concern, Manypenny stated that:

> It will be our desire to give to each individual & head of a family such a title as that he can distinguish what is his own.  There will be some restriction on the right of selling.  Except that your title will be like the White man's.  This restriction will, when it seems wise & proper be withdrawn.

(*Id.* at PageID # 7001.)

After Manypenny spoke, a Band leader at the meeting requested that "[w]e wish that you would give us titles – good titles to these lands.  That these papers will be so good as to prevent any white man, or anybody else from touching these lands."  (*Id.* at PageID # 7007.)  Gilbert stated that the government intended "to allow each head of family 80 acres of lands and each single person over 21 years of age 40 acres of land."  (ECF No. 558-9 at PageID # 7067.)  And Manypenny suggested that "it will be easier for the government to give you absolute titles," subject to alienation restrictions for a short time period.  (*Id.* at PageID # 7070.)  On July 31, 1855, after further negotiation, the Band and the federal government signed a treaty outlining the terms of the agreement.  At the negotiation's conclusion, the Band's leaders expressed satisfaction with its terms.  Before leaving, one Band leader proclaimed, "We are satisfied with what is done.  We wish you to carry out the treaty as it made.  We believe it to be good."  (*Id.* at PageID # 7083.)

**The Treaty of 1855**

Overall, the Treaty of 1855 reflected the negotiations between the Band and the federal government.  Article 1 described the specific tracts of land the United States would withdraw from sale to be made readily available to the Band.  *Treaty with Ottowas and Chippewas* (*1855 Treaty*) (July 21, 1855), Art. 1, 11 Stat. 621.  This first provision provided each head of the family with 80 acres of land, or each single person over 21 years of age with 40 acres of land.

Article 1 also required tribal members to make land selections within two five-year periods to be accompanied with a restriction on resale of the land for ten years for those who took title in the initial five-year period.  The United States reserved ownership of land the Band did not select within the ten-year timeframe.  Lastly, that provision stipulated, "[n]othing contained herein shall be construed as to prevent the appropriation, by sale, gift, or otherwise, by the United States, of any tract or tracts of land within the aforesaid reservations."  (*Id.*)

The Treaty contained other provisions that are not in direct dispute on appeal.  Article 2 described the payments that the United States would disburse to the Band; Article 3 released the United States from any claims arising out of any previous treaties; Article 4 provided for translators to help in communication between the Band and the federal government; Article 5 dissolved the federal organization of Ottawa and Chippewa Indians for purposes of treaty negotiation; and Article 6 made the agreement obligatory and binding, subject to the ratification of the President and the United States Senate.  With minor modification, the United States Senate approved the Treaty, and President Franklin Pierce signed the Treaty.

**Events following the Treaty of 1855**

After Congress ratified the Treaty, the federal government poorly implemented the Treaty's provisions.  The Michigan agency charged with its implementation had significant turnover in its leadership that led to a disorganized rollout of land selection.  The dysfunction delayed some of the Band's over 5,000 members from purchasing land in a timely fashion.  And the federal government did not distribute the annuities on the schedule promised.  A Michigan newspaper, *The Grand Traverse Herald*, described the difficulty the Band had in obtaining land under the Treaty.  In a profile in April 1869, a journalist documented that the "Indian Department failed to make such selections of land for said Indians within the time specified in said treaties; in fact, said selections were not completed until the year 1866."  (ECF No. 600-101 at PageID # 10937.)  Michigan delegates in Congress even considered a resolution to extend the time for tribal members to purchase land but were met with resistance from white settlers who wanted the land to be returned to the public marketplace.

For the most part, the federal government resisted white settlers' demands to occupy the lands held for the ten-year term in the Treaty.  But occasionally their efforts were unsuccessful.  For example, the Michigan Indian Agency wrote to the federal Commissioner of Indian Affairs in 1865, stating "certain white men through the Agency of Indians had been purchasing some of the lands, which were withdrawn from sale for the use and benefit of the Ottawa and Chippewa Indians in this state."  (ECF No. 600-91 at PageID # 10901.)  To make matters worse, the federal government did not provide timely title to the land as promised to many Indian families.  In 1872, a Michigan Indian Agent wrote to the federal Commissioner of Indian Affairs to express that certain tribes "were not furnished their patents . . . [and] we were all surprised to find that only the Mackinaw, and Little Traverse bands were furnished, while the other bands about equal in number were all without patents though they held the same promising official certificates."  (ECF No. 600-110 at PageID # 10996.)  That same year, Congress passed legislation allowing unsold land to return back to the public, alongside additional provisions to assist tribal members in receiving patents in subsequent years.  As stipulated, the United States returned all unsold land contained in the Treaty back to the marketplace for others to purchase.  And eventually, the remaining Band members who wanted to purchase land under the Treaty were able to do so.  In total, 1,863 Band members received land covering 121,450 acres.  Primarily, Band members received land plots in northwest Isabella County, Michigan and central Emmet County, Michigan.  Thereafter, members of the Band settled permanently on the land, each holding an individual title to his or her property.  While the Band held title to the lands they selected, over the next several decades, many lost their homes as a result of fraud or tax forfeiture.  In the twentieth century, the Treaties the Band signed once again came into dispute.

**Events before the Indian Claims Commission**

Decades after signing the Treaty, in 1949 and 1951, the Band filed claims before the Indian Claims Commission (ICC) to revisit the agreements the tribes made with the United States.  For reference, the ICC was the sole dispute mechanism between tribes and the United States at the time of its creation.  Prior to its establishment, tribes were unable to resolve disputes against the United States without congressional approval.  *See Otoe & Missouria Tribe of Indians v. United States*, 131 F. Supp. 265, 272 (1955).  On occasion, Congress allowed tribes to

bring petitions before the Court of Claims, but that proved to be a taxing process, and tribes often returned to Congress for further redress after unsatisfactory judicial outcomes.  *See id.*  To resolve the issue permanently, the federal government established the ICC to adjudicate "both ancient and contemporary tribal claims against the federal government."  Indian Claims Commission Act of 1946, § 12 Pub. L. No. 79–726, 60 Stat. 1049.  As part of the ICC Act of 1946, Congress required tribes to bring claims within five years for any dispute arising before 1946 or risk waiver of the claims.  *See Pueblo of Santo Domingo v. United States*, 16 Cl. Ct. 139, 141 (1988).  The ICC held jurisdiction over these disputes on a temporary basis, in hopes of "bring[ing] about a settlement of outstanding Indian claims on a fair and equitable basis and in as expeditious a manner as possible," and was dissolved in 1978.  *Otoe & Missouria Tribe of Indian*, 131 F. Supp. at 272.  In 1978, the ICC transferred its remaining cases to the Court of Claims, which would resolve any final tribal disputes.

The Band brought three claims before the ICC that are relevant to the present case.  In 1949, under ICC Docket No. 58, the Band claimed that the United States provided "grossly inadequate and unconscionable" consideration in exchange for the land that the Band ceded in the Treaty of 1836.  (ECF No. 429-1 at PageID # 5116.)  In sum, the Band believed that the land was worth more than $1.25 per acre, and yet, the federal government paid 16.8¢ per acre at the time of cession.  The Band asked the court for compensation for the reasonable value of the land, attorney's fees, and other expenses that would occur because of the proceedings.  The same year, the Chippewa tribe brought a separate case before the ICC, under Docket No. 18E, arguing a claim similar to the one presented in Docket No. 58, which asserted that the United States had provided inadequate consideration under the Treaty of 1836.  In addition, they requested compensation for land ceded because the federal government had executed the relevant treaties under misrepresentation and fraud.

The ICC consolidated both dockets into a single proceeding.  On May 20, 1959, the Commission issued a finding of fact, stating in sum that the tribes had ceded 12,044,934 acres of land in 1936, and retained 401,971 acres for themselves as a temporary reservation.  *See Chippewa Indians, et al., v. United States*, 7 Ind. Cl. Comm. 576 (1959).  Almost ten years later, in 1968, the ICC determined that the value of the ceded land in 1836 was 90¢ per acre, or

$10,800,000 in full, after considering its agricultural and farming potential.  *See Chippewa Indians, et al., v. United States*, 20 Ind. Cl. Comm. 137 (1968).  In response, the federal government argued that the value of the land should be offset by the 121,450 acres allotted to the Band in the Treaty of 1855.  In rejecting the government's position, the Commission determined that the purpose of the "1855 Treaty was to return to the individual Ottawas and Chippewas a portion of the lands which they had collectively ceded in [the Treaty of] 1836."  (ECF No. 429-5 at PageID # 5218.)  In its opinion, the Commission expressed further:

> [B]y granting lands within [northern Michigan] to the Ottawas and Chippewas on an individual basis, the United States achieved a viable alternative to the unworkable plan to relocate these Indians to "the country between Lake Superior and the Mississippi", as expressed in the 1836 Treaty.  By allowing these Indians continuous possession of the lands which they were authorized to occupy until the specific allotments were selected, the defendant saved itself the effort and expense of relocation as well as the cost of the lands which, in the 1836 Treaty, it had obligated itself to furnish.

(*Id*.)

But the Commission also decided that the government should not pay for land the Band already owned.  Instead, the ICC deducted $109,305.67 from the compensation owed to the Band.  After a final calculation, it concluded that the Band was owed $10,300,247, which was subsequently amended to $10,109,003.55 in further proceedings.

In 1951, the Band filed a third petition, claiming that the Band was owed compensation for land that was never allotted to them under the Treaty of 1855.  The Commission rejected the claim, ruling that the outcome of prior ICC proceedings was the final determination in regards to the Treaties, and the Band was now barred from raising further arguments about the agreements.  This ruling was the final legal proceeding regarding the Treaties until the 21st century.  Until this day, many members of the Band still reside in northern Michigan.

### B.  Procedural History

On August 21, 2015, the Band filed a lawsuit in federal court in the Western District of Michigan against Governor Rick Snyder, seeking a declaration that the Treaty of 1855 created a reservation for the Band.  As part of the lawsuit, the Band petitioned for an injunction against the

State of Michigan to prevent any actions that ran contrary to the Band's reservation status under federal law. Thereafter, several other parties, including the City of Charlevoix, the Emmet County Lake Shore Association, The Protection of Rights Alliance, and several other townships and cities located in northern Michigan, intervened to litigate their interests in the outcome of the case. On May 20, 2016, the Band filed a motion for partial summary judgment on their claim that the Treaty of 1855 established a reservation, to which Defendant Snyder, and various cities and counties, as Defendant-Intervenors, filed an opposing motion for summary judgment. In his motion, Defendant Snyder argued that 1) the Treaty of 1855 did not meet the three-part test for Indian country; 2) if the Treaty of 1855 created an Indian reservation, it was temporary and terminated when Band members received their patents; and 3) if the Treaty of 1855 created a permanent Indian reservation, Congress disestablished it in the 1870s. Separately, Defendant-Intervenors filed for judgment on the pleadings, claiming that: 1) the Band should be judicially estopped from arguing that a reservation exists because of its prior proceedings before the ICC; 2) the Band should be barred from relitigating claims under the doctrine of issue preclusion because of the same proceedings previously filed before the ICC; and 3) the ICC's statute of limitations barred the Band from raising further claims in relation to the Treaty of 1855.

The district court rejected Defendant-Intervenors' motion for judgment on the pleadings on January 31, 2019. In a well-reasoned opinion, on August 15, 2019, the district court issued an order granting Defendant's and Defendant-Intervenors' motion for summary judgment, stating that the Treaty of 1855 "could not plausibly be read to have created a reservation." (ECF No. 627.) The Band subsequently filed this timely appeal and Defendant-Intervenors cross-appealed.

## II. DISCUSSION

### A. The Band's Claim of a Federal Reservation Under the Treaty of 1855

#### 1. Standard of Review

"[T]his court reviews a district court's grant of summary judgment de novo." *Rd. Sprinkler Fitters Local Union No. 669, U.A., AFL-CIO v. Dorn Sprinkler Co.*, 669 F.3d 790, 793 (6th Cir. 2012). Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  There is a dispute as to a material fact when "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013) (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 551 (6th Cir. 2002)).  The court must evaluate the evidence in a motion for summary judgment "in the light most favorable to the party opposing the motion."  *Nickels v. Grand Trunk W. R.R.*, 560 F.3d 426, 429 (6th Cir. 2009).

### 2.  Relevant Legal Principles

Under federal law, Indian Country is land "validly set apart for the use of the Indians, as such, under the superintendence of the [g]overnment."  *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 511 (1991) (quoting *United States v. John*, 437 U.S. 634, 648–49 (1978)).  "Indian Country" serves as an umbrella term for Indian reservations, dependent Indian communities, and Indian allotments.  *See* 18 U.S.C. § 1151. Despite its present-day meaning, the word reservation, as used in the nineteenth century, "had not yet acquired such distinctive significance in federal Indian law."  *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2461 (2020).  Most typically, Indian reservations were created through acts of Congress that provided tracts of land to tribes, with the right of self-government and outside the purview of state jurisdiction.  (*Id.*)  In contrast, Indian allotments were typically smaller lots owned by individual tribal members.  *Id.* at 2463 (citing *Cohen's Handbook of Federal Indian Law*, § 1.04 (2012), discussing General Allotment Act of 1887, Ch. 119, 24 Stat. 388). Dependent Indian communities formed a third category that "refer[ed] to a limited category of Indian Lands that are neither reservations nor allotments," but were still set aside by the federal government under federal superintendence.  *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 527 (1998).

To assess whether the Treaty of 1855 created an Indian reservation, we look to the governing agreement between the federal government and the Band.  Treaties are "interpreted liberally in favor of the Indians."  *Keweenaw Bay Indian Cmty. v. Naftaly*, 452 F.3d 514, 524 (6th Cir. 2006) (quoting *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 200 (1999)).  Alongside the treaty's language, we may look "beyond the written words to the larger

context that forms the [t]reaty, including 'the history of the treaty, the negotiations, and the practical construction adopted by the parties.'"  *Mille Lacs*, 526 U.S. at 196 (quoting *Choctaw Nation v. United States*, 318 U.S. 423, 432 (1943)).  "[E]xpressions of tribal and congressional intent" are critically important, and "legal ambiguities are resolved to the benefit of the Indians."  *DeCoteau v. Dist. Cty. Court for Tenth Judicial Dist*., 420 U.S. 425, 447 (1975).  Critically, we must look to how "Indians would have understood [the treaty]" at the time it was signed.  *Mille Lacs*, 526 U.S. at 197.

### 3.  Application to the Matter at Hand

The district court properly granted summary judgment to Defendants on their claim that the Treaty of 1855 did not create a reservation for the Band.  We hold that the treaty provided for allotments of land, which would not fall under federal superintendence, rather than a collective Indian reservation.  Under the Treaty's language, its precedent negotiations, and the practical construction of the Treaty provisions adopted between the parties, the land cannot be said to be "validly set apart for the use of the Indians . . . under the superintendence of the [federal] [g]overnment."  *Citizen Band*, 498 U.S. at 511 (quoting *United States v. John*, 437 U.S. 634, 649 (1978); *see also Mille Lacs*, 526 U.S. at 196.

### i.  Land set apart for Indian purposes

Alongside the power of Congress to ratify treaty agreements with tribal nations, "[f]rom an early period in the history of the government it was the practice of the President to order, from time to time, . . . parcels of land belonging to the United States to be reserved from sale and set apart for public uses."  *Hagen v. Utah*, 510 U.S. 399, 412 (1994) (quoting *Grisar v. McDowell*, 6 Wall. 363, 381, 18 L. Ed. 863 (1868)).  "This power of reservation was exercised for various purposes, including Indian settlement, bird preservation, and military installations, 'when it appeared that the public interest would be served by withdrawing or reserving parts of the public domain.'"  *Id.* (quoting *United States v. Midwest Oil Co.*, 236 U.S. 459, 471 (1915)).  In the settlement context, land was "validly set apart" when it was "held by the Federal Government in trust for the benefit of the [tribe]."  *Citizen Band*, 498 U.S. at 511.  In other words, land would be

"segregated from the public domain" for a tribe's settlement.  *United States v. Pelican*, 232 U.S. 442, 445 (1914).

Under Article 1 of the Treaty of 1855, the Band and the United States agreed to allow land in northern Michigan to be "withdrawn from sale for the benefit of said Indians." *1855 Treaty*, Art. 1, 11 Stat. 621.  The Treaty's language makes clear that the land was "held by the Federal Government in trust for the benefit of the [tribe]."  *Citizen Band*, 498 U.S.at 511. When "construed liberally in favor of the Indians," we conclude that the land was set apart. *Naftaly*, 452 F.3d at 524.[1]

Coupled with this finding, however, we must also inquire into whether the land is used for Indian purposes.  *Citizen Band*, 498 U.S. at 511; *see also S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 784 (10th Cir. 2005) ("[R]eservation necessarily includes a withdrawal; but it also goes a step further, effecting a dedication of the land to specific public uses.").  Land used for Indian purposes will be owned with "restraints on alienation or significant use restrictions."  *Venetie*, 522 U.S. at 532.  If a tribe is free to use the land for non-Indian purposes, courts "must conclude that the federal set aside requirement is not met."  (*Id.*)  In the instant case, Article 1 of the Treaty contains no textual requirement that the land be used for a specific purpose.  *1855 Treaty*, Art. 1, 11 Stat. 621.  Instead, it provides for a ten-year restraint on alienation and provision of trusteeship for lands selected by tribal members who were citizens of the state and who took possession of their selected land within the first five-year period after the Treaty's signing, but no restrictions for those members who took possession of land in the second five-year period.  (*Id.*)  That suggests the parties intended for tribal members to have freedom of title after the full ten-year period.  Further, the "lands remaining unappropriated by or unsold to the Indians after expiration of the last-mentioned term" were scheduled to be "sold or disposed of by the United States as in the case of all other public lands."  (*Id.*)

---

[1]Defendants emphasize that the Treaty of 1855 withdrew lands from the public domain only temporarily, and that the temporal nature of the withdrawal negates our conclusion.  Not so.  The Treaty of 1836, between the Band's predecessors and the federal government, set apart lands temporarily, "for the term of five years from the date of the ratification of th[e] treaty . . . ."  *Treaty with the Ottawas, Etc.* (*1836 Treaty*) (Mar. 28, 1836), Art. 2., 7 State. 491.  But both parties agree that the Treaty of 1836 involved a valid set-aside of land and ultimately established a reservation for the Band's predecessors, albeit with a built-in expiration date.

We hold that the Treaty created an arrangement closer to a land allotment system than a reservation.  *See Cohen's Handbook of Federal Indian Law*, § 3.04[2][c][iv] (2019); *see also id.* at § 16.03[2][e] (describing "public domain allotments" whereby the federal government would authorize Indians who were state citizens to purchase land withdrawn from the public domain and subject to temporary restrictions on alienation and provisions of trusteeship).   Therefore, although the Treaty of 1855 might have set apart land for an Indian purpose, that purpose was not a reservation.

Consistent with the above, the language in the Treaty of 1855 is quite different from the Treaty of 1836 that clearly established a reservation between the Band's predecessors and the federal government.  *Compare 1855 Treaty*, Art. 1, 11 Stat. 621 (recording lands "withdrawn from sale for the benefit of said Indians hereinafter provided" and detailing a complex procedure for individual Indians and families to make "selections of lands" and to "take immediate possession thereof" with specified restrictions) *with 1836 Treaty*, Art. 2, 7 State. 491 (stating plainly that "the tribes reserve for their own use, to be held in common the following tracts . . . ."). To the extent it is appropriate to examine reservation treaties entered between other tribes and the federal government "from the same era" at issue in this case, *see McGirt*, 140 S. Ct. at 2461 (examining the Menominee's treaty to interpret the Creek's), those treaties also differ from the Treaty of 1855 in important respects.  *See, e.g.*, *Treaty with the Chippewa* (1855), 10 Stat. 1165 ("There shall be, and hereby is, reserved and set apart, a sufficient quantity of land for the permanent homes of the said Indians; the lands so reserved and set apart, to be in separate tracts, as follows . . . .");[2] *Treaty with the Menominee* (1854), 10 Stat. 1064 ("[f]or the purposes of giving them . . . a permanent home . . . to be held as Indian lands are held");[3] *Treaty with the Kickapoo* (1854), 10 Stat. 1078 ("[S]aving and reserving, in the western part thereof, one

---

[2]Recognized as having created a reservation in *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 184 (1999).

[3]Recognized as having created a reservation in *Menominee Tribe v. United States*, 391 U.S. 404, 405 (1968).

hundred and fifty thousand acres for a future and permanent home, which shall be set off for, and assigned to, them by metes and bounds.").[4]

Alongside the Treaty's text, the Treaty negotiations illustrate that the Band and the federal government wished to provide tribal members with individual titles to land (indicative of allotment) rather than communal title (indicative of reservation).  Before negotiating the Treaty of 1855, Commissioner Manypenny set aside plots of land that would "substitute, as far as practicable, for their claim to lands in common, titles in fee to individuals for separate tracts of land."  (ECF No. 559-43 at PageID # 8376.)  During Treaty negotiations, one tribal leader expressed anxiety that, as with the Treaty of 1836, tribal members would not be given true title to the land because "you will take them back."  (ECF No. 558-9 at PageID # 7069.)  Manypenny responded that "the land will [not] be pulled from you," and the initial restriction of alienation would provide "good, strong papers, so that your children may inherit your lands."  (*Id.* at PageID # 7069.)  To ease the Band's concerns, he also expressed that "[i]t will be our desire to give each individual and head of a family such a title as that he can distinguish what is his [own.]"  (*Id.* at PageID # 7061.)  Manypenny believed that restricting resale for five years would encourage permanent settlement on the tracts of land.  Thereafter, individual tribal members would be free to use their land as they pleased.

The parties' practical construction of the Treaty of 1855 after its signing further supports our conclusion.  For example, shortly after signing the Treaty, the Ottawa Indians of Michigan wrote to the Office of Indian Affairs to request additional educational assistance.  In the letter, Andrew J. Blackbird, a tribe leader and historian, observed that the tribe had "abandoned" its "laws, customs and manners" and "renounced their chiefdoms."  (ECF. No. 559-48 at PageID # 8424.)  He noted that the tribe was now "under the laws of the State of Michigan and the United States," having "equal rights and privileges with American citizens . . . to have and to hold, to buy and to sell, to prosecute and be prosecuted . . .  So we are to be no more as children of men, for we have been such already too long."  (*Id.*)

---

[4]Recognized as having created a reservation in *United States v. Reily*, 290 U.S. 33, 35 (1933).

To be sure, the Band points our attention to several other letters from certain tribal members which speak of "our reservations,"[5] in addition to a number of letters between federal Indian officials discussing the Treaty's "reservation" of land for the Band.[6]  But it is unclear in those letters whether the tribal members and federal officials used the word "reservation(s)" as a legal term of art under federal Indian law, or as it was used in common parlance.  *See McGirt*, 140 S. Ct. at 2461 (recognizing that the term "reservation" did not always carry with it the "distinctive significance in federal Indian law" that it now does).  The same goes for the reference by Congress in the Act of 1872 to "all the lands remaining undisposed of in the reservation made for the Ottawa and Chippewa Indians of Michigan by the treaty of [1855]." Act of 1872, 42nd Cong., Ch. 424, 17 Stat. 381 (June 10, 1872).

Moreover, although the federal government tracked Indian reservations generally, it did not identify the Article 1 lands listed in the Treaty of 1855 as a reservation.[7]   And when Congress further discussed the Treaty of 1855 in the Act of 1876, it omitted the word "reservation" included in the 1872 Act, demonstrating that the lands were no longer withheld from sale and, therefore, were not even reserved in the common sense of the word.  Act of 1876, 44 Cong., Ch. 105, 19 Stat. 55 (May 23, 1876).  What is more, when the Band began actively lobbying Congress to reaffirm its federal trust relationship—which the federal government had mistakenly repudiated—it did not ask Congress to reaffirm an 1855 Treaty reservation.  (ECF. No. 507-1, PageID # 5764, 5796–797, 5802–809.)   Finally, the statutory reservation that Congress subsequently established for the Band consists of its trust lands in Emmet and Charlevoix counties in a geographic area that does not match the boundaries of the townships

---

[5](Tribal Chief Letter, ECF. No. 600-62 at PageID # 10814; Indian Letter (1859), ECF. No. 600-60 at PageID # 10810; Indian Letter (1860), ECF. No. 600-62 at PageID # 10814; Indian Letter (1861), ECF. No. 600-63 at PageID # 10819; Indian Letter (1861), ECF. No. 600-64 at PageID # 10827; Ottawa Letter, ECF. No. 560-07 at PageID # 8701; Ottawa and Chippewa Letter, ECF. No. 560-08 at PageID # 8706.)

[6](Commissioner Dole, ECF. No. 559-41 at PageID # 8355; Commissioner Greenwood, ECF. No. 559-57 at PageID # 8512; Commissioner Clum, ECF. No. 559-76 at PageID # 8674; Commissioner Mix, ECF. No. 600-79 at PageID # 10868; Commissioner Drummond, ECF. No. 559-74 at PageID # 8659; Commissioner Wilson, ECF. No. 559-56, PageID # 8507.)

[7](1878 Map, ECF. No. 558-28 at PageID # 7260; 1883 Map, ECF. No. 558-29 at PageID # 7262; 1896 Map, ECF. No. 558-30 at PageID # 7264; 1875 ARCOIA, ECF. No. 558-72 at PageID # 7816, 7824; 1876 ARCOIA, ECF. No. 558-73 at PageID # 7831, 7833; 1877 ARCOIA, ECF. No. 558-74 at PageID # 7838, 7840.)

listed in Article 1 of the Treaty of 1855.  *See* Little Traverse Bay Bands of Odawa Indians and
Little River Band of Ottawa Indians Act, Pub. L. No. 103-324, 108 Stat. 2156, §6 (1994).

When reviewed in full, "the history of the treaty, [its precedent] negotiations, and the
practical construction adopted by the parties" demonstrate that the Treaty did not provide land
for Indian reservation purposes; but rather, it was intended to allot plots of land so members of
the Band could establish permanent homes.  *Mille Lacs*, 526 U.S. at 196.[8]

### ii.  Land under federal superintendence

Federal superintendence is also required to establish an Indian reservation under federal
law.  *See Citizen Band*, 498 U.S. at 511.  Federal superintendence arises where "the Federal
Government and the Indians involved, rather than the States, are to exercise primary jurisdiction
over the land in question."  *Venetie*, 522 U.S. at 531.  In that regard, "it is the land in question,
and not merely the Indian tribe inhabiting it, that must be under the superintendence of the
Federal Government."  *Id.* at 530 n.5 (citations omitted).  Federal superintendence has thus been
found where the United States "*actively* control[s] the lands in question, effectively acting as a
guardian for the Indians."  *Id.* at 533 (emphasis added).  Typically, the federal government
controls land through restraints on alienation, indicating that lands are intended to remain under
federal jurisdiction.  *See, e.g.*, *Pelican*, 232 U.S. at 449.

The Band omits this element in its brief; the omission constitutes a legal error.
Repeatedly, the Supreme Court has included federal superintendence as a requirement for
establishing Indian Country generally.  *See United States v. McGowan,* 302 U.S. 535, 537 (1938)
(declaring the disputed land Indian Country in part because the federal government held
ownership of the land to protect dependent Indians living there); *Pelican*, 232 U.S. at 447
(holding that the disputed land was Indian Country where it was "under the jurisdiction and

---

[8]We recognize, as *McGirt* did, that allotments are not "inherently incompatible with reservation status."
140 S. Ct. at 2475.  But a lack of inherent incompatibility with reservation status does not mean that an Indian
reservation is established wherever allotments are provided for.  *See United States v. Pelican*, 232 U.S. 442, 449
(1914) (holding that even where a reservation was diminished, the allotments continued to be Indian Country); *see
also Cohen's Handbook of Federal Indian Law*, § 3.04[2][c][iv] (2012) (noting that some Indian allotments were not
made within reservations).  In the final analysis, we hold that based on the Treaty negotiations, and the Treaty's text
and construction, neither the Band nor the federal government intended to create an Indian reservation.

control of Congress for all governmental purposes, relating to the guardianship and protection of the Indians"). We follow the Court's lead.

Under the terms of the Treaty of 1855, the federal government might have exercised some federal superintendence over the land at issue, but not for purposes of maintaining an Indian reservation. Particularly relevant to this discussion is the Supreme Court's decision in *United States v. Pelican*, 232 U.S. 442 (1914). There, the Court found federal superintendence where the Colville tribe's land in Washington State was subjected to restraints on alienation and provisions of trusteeship for a 25-year period. *Id.* at 449. Accordingly, the land "still retain[ed] during the trust period a distinctively Indian character, being devoted to Indian occupancy under the limitations imposed by Federal legislation." *Id.* But the Court in *Pelican* made clear that the Colville tribe did not retain a reservation; their previously established reservation was "diminished," and the federal superintendence discussed was related to the newly established system of allotment. That applies here as well—at least for a portion of the lands at issue. The Band's reservation established in the Treaty of 1836 was diminished under that Treaty's own terms. *See 1836 Treaty*, Art. 2, 7 Stat. 491. The Band's new arrangement in the Treaty of 1855—pertaining to the lands selected in the first five-year period—were, like those in *Pelican*, subject to several years of inalienability and trusteeship.[9] *1855 Treaty*, Art. 1, 11 Stat. 621. During that time, they remained "devoted to Indian occupancy" under the limitations imposed by the Treaty. *Pelican*, 232 U.S. at 449. So, under the Treaty of 1855, those tracts of land might appropriately be deemed "under federal superintendence," but only for the time the restraints remained, and only for purposes of allotment, not reservation.

The Treaty's provision for selection of land during the second five-year period and thereafter also supports our conclusion that it did not establish federal superintendence indicative of reservation status. As mentioned previously, the land selected and purchased during those phases were dispersed without any restraints on alienation or other restrictions. *1855 Treaty*,

---

[9]As written, the Treaty of 1855 subjected the tracts of land selected during the first five-year period to restraints on alienation and provisions of trusteeship for ten years. *1855 Treaty*, Art. 1, 11 Stat. 621. But for many, whose patents did not issue until the 1870s, they lasted much longer. (ECF. No. 559-04; 559-09.)

Art. 1, 11 Stat. 621.  Plainly, no evidence of federal superintendence exists for the land dealt out in those phases.

Of course, other provisions in the Treaty of 1855 indicate that the federal government did provide continual support for the Band, such as Article 2, which details the disbursement of funds to the Band for education, annuities, and agricultural assistance.  *Id.* at Art. 2, 11 Stat. 621.  But even when accounting for those disbursements, "health, education, and welfare benefits are merely forms of general federal aid[,] . . . they are not indicia of active federal control over the Tribe's land sufficient to support a finding of federal superintendence."  *Venetie*, 522 U.S. at 534.

Further, during the negotiations, the leaders of the Band made clear that they did not want land under federal superintendence or federal control.  Indeed, tribal members made repeated requests during treaty negotiations to have title to land that would be equal to that of their white counterparts.  For instance, one tribal leader requested for the Band "to choose like the whites and have their titles."  (ECF No. 558-9 at PageID # 7069.)  Another leader stated, "we think that we are old enough to take care of our papers[;] . . . [w]e think that we can take as good care of your papers as we do of [our ancestors' papers.]"  (*Id.* at PageID # 7064.)  And like their white counterparts, the Band wanted to become citizens and pay taxes.  After hearing the federal government would provide them with titles to land, one leader stated, "[w]e are willing to pay our way up on this land – to pay our taxes as you do.  You have opened your heart to give us land; we do not think you ought to feed us and our children forever."  (*Id.* at PageID # 7065.)

The government also made clear its desire for Band members to be independent from governmental support.   The year before negotiations began, Henry Gilbert wrote to George Manypenny stating, "that within three or four years all connection with and dependence upon Government on the part of the Indians may properly cease."  (ECF No. 559-33 at PageID # 8285-8286.)   In reference to money owed to the Band during the negotiations, Gilbert expressed, "we think that the time will shortly come, when you can take care of [the fund] for yourself[,] . . . [s]o that I think we must fix a time, when your connection with the U.S. shall cease." (ECF No. 558-8 at PageID # 7030-7031.)  Manypenny held a belief similar to Gilbert's.

Eventually, Manypenny wanted the tribes to "take care of themselves," and he knew that a permanent home would assist them in achieving full independence.  (*Id.* at PageID # 7030-7031.)

The parties' practical construction of the Treaty, discussed previously, further supports the notion that the federal government did not intend, nor did it seek, to guard over any of the land the tribal members owned as it would a reservation.  Rather, the United States and the Band negotiated a treaty that the parties believed would finally lead to the Band's independence.  The Band's ancestors understood that the treaty would provide individual allotments of land to its members.  *See Mille Lacs*, 526 U.S. at 197.  And it appears the Band's ancestors not only agreed to this arrangement, but also desired it, to ensure they would never lose their homes in Michigan. As a result, we find that the Treaty of 1855 did not create a system of federal superintendence sufficient to establish an Indian reservation for the Band.[10]

### III. CONCLUSION

The case before us has raised important questions of federal Indian law.  We are tasked with deciding whether a treaty formed well over a century ago created a reservation, even as the word reservation holds different significance today.  Upon review of its language, its precedent negotiations, and its practical construction adopted by the parties, we conclude that the Treaty of 1855 did not create a federal Indian reservation; but rather, created a form of land allotment— akin to a public domain allotment—for individuals within the Band to obtain permanent homes. From the record, it is apparent that the Band faced a series of difficult choices, which included whether to leave their home in Michigan or bargain with the United States to stay in Michigan permanently.  It is not lost on this court that those decisions were not made in haste or without forethought.  In light of those decisions, we reviewed the agreements the Band signed in 1836 and 1855 and sought to determine how the Band would have understood them.  The Band chose

---

[10]Because we affirm the district court's judgment that the Treaty of 1855 did not create an Indian reservation for the Band, we decline to address Defendant-Intervenors' judicial estoppel and issue preclusion arguments raised in their cross appeal.  *See Anderson v. Roberson*, 90 F. App'x 886 (6th Cir. 2004) (holding that an appellate court has jurisdiction over issues raised in a protective cross appeal but should not address them unless "it is appropriate to do so after the disposition of the appeal"—*i.e.*, if the court plans to reverse the district court based on its consideration of the main issue on appeal).

to provide allotments of land for their members, not a reservation for the tribe.   For these reasons, we affirm the district court.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 19-2070/2107

LITTLE TRAVERSE BAY BANDS OF ODAWA INDIANS,

 Plaintiff - Appellant/Cross - Appellee,

 v.

GRETCHEN WHITMER, Governor of the State of Michigan,

 Defendant - Appellee,

CITY OF PETOSKEY, MICHIGAN; CITY OF HARBOR SPRINGS, MICHIGAN; EMMET COUNTY, MICHIGAN; CHARLEVOIX COUNTY, MICHIGAN,

 Intervenors Appellees/Cross - Appellants,

TOWNSHIP OF BEAR CREEK; TOWNSHIP OF BLISS; TOWNSHIP OF CENTER; TOWNSHIP OF CROSS VILLAGE; TOWNSHIP OF FRIENDSHIP; TOWNSHIP OF LITTLE TRAVERSE; TOWNSHIP OF PLEASANTVIEW; TOWNSHIP OF READMOND; TOWNSHIP OF RESORT; TOWNSHIP OF WEST TRAVERSE; EMMET COUNTY LAKE SHORE ASSOCIATION; THE PROTECTION OF RIGHTS ALLIANCE; CITY OF CHARLEVOIX, MICHIGAN; TOWNSHIP OF CHARLEVOIX,

 Intervenors - Appellees.

> **FILED**
> May 18, 2021
> DEBORAH S. HUNT, Clerk

Before:  BATCHELDER, CLAY, and BUSH, Circuit Judges.

**JUDGMENT**

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk